IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

UNITED STATES OF AMERICA,
    Plaintiff,

vs.

GREGORY LEE PETTIT,
    Defendant.

DOCKET NO. 1:25-CR-58

## **DEFENSE PROPOSED JURY INSTRUCTIONS**

      Gregory Lee Pettit, through undersigned counsel, hereby submits his proposed jury instructions. Where possible, Mr. Pettit utilized this Court's instructions from prior cases. And when needed, instructions and definitions were drawn from pertinent statutes and legal authority. Finally, the following instructions are not exhaustive but are intended to address matters Mr. Pettit anticipates will be at issue in this specific case.

      Dated: September 15, 2025        Respectfully Submitted,

                                        s/**Rhett H. Johnson**
                                        Rhett Hunter Johnson
                                        N.C. Bar #35365
                                        Assistant Federal Public Defender
                                        Federal Public Defender for the
                                        Western District of North Carolina
                                        1 Page Avenue, Suite 210
                                        Asheville, NC 28801
                                        Phone: (828) 232-9992
                                        E-Mail: Rhett_Johnson@fd.org

1

## DEFENSE PROPOSED INSTRUCTION NO. 1

### Not Required to Accept Uncontradicted Testimony

You are not required to accept testimony, even though the testimony is uncontradicted and the witness is not impeached. You may decide, because of the witness' bearing and demeanor, or because of the inherent improbability of their testimony, or for other reasons sufficient to you, that such testimony is not worthy of belief.

## DEFENSE PROPOSED INSTRUCTION NO. 2

### Impeachment by Prior Inconsistent Statements, Not Under Oath

The testimony of a witness may be discredited or impeached by showing that they previously made statements that are inconsistent with their present testimony. The earlier contradictory statements are admissible only to impeach – to challenge – the credibility, and not to establish the truth of these statements. It is the province of the jury to determine the credibility, if any, to be given the testimony of a witness who has been impeached.

If a witness is shown to have knowingly testified falsely concerning any material matter, you have a right to distrust such witness' testimony in other particulars; and you may reject all the testimony of that witness or give it such credibility as you may think it deserves.

You will recall that several witnesses testified during the trial. You will also recall that it was brought out that before this trial they made statements about this matter that are inconsistent. These earlier statements were brought to your attention to help you decide if you believe the witness' testimony. You cannot use these earlier statements as evidence in this case. However, if a witness said something different about this matter earlier, and the two stories were conflicting, then there may be reason for you to doubt their testimony.

3

## DEFENSE PROPOSED INSTRUCTION NO. 3

### Impeachment by Bias or Prejudice

In examining witness testimony generally, you may consider any demonstrated bias, prejudice, or hostility of a witness towards the defendant, or bias in favor of the Government, in determining the weight to be afforded to that testimony.

## DEFENSE PROPOSED INSTRUCTION NO. 4

### Number of Witnesses Called is not Controlling

Your decision on the facts of this case should not be determined by the number of witnesses testifying for or against a party. You should consider all the facts and circumstances in evidence to determine which of the witnesses you choose to believe or not believe. You may find that the testimony of a smaller number of witnesses on one side is more credible than the testimony of a greater number of witnesses on the other side.

## DEFENSE PROPOSED INSTRUCTION NO. 5

### Mr. Pettit's Testimony (Alternative to Instruction No. 6)

You have heard the testimony of Mr. Gregory Pettit. You should judge his testimony in the same manner as you judge the testimony of any other witness.

**DEFENSE PROPOSED INSTRUCTION NO. 6**

**Defendant's Decision Not to Testify (Alternative to 5)[1]**

Should Mr. Pettit choose not to testify at the trial, he requests that the jury be instructed as follows:

(1)    A defendant has an absolute right under our Constitution not to testify. The fact that he did not testify cannot be considered by you in any way. It must not even be discussed in any way during your deliberations and in arriving at your verdict. No presumption of guilt may be raised, and no inference of any kind may be drawn from the fact that an accused person decided to exercise his constitutional privilege to not testify.

(2)    Remember that it is up to the Government to prove the Mr. Pettit guilty beyond a reasonable doubt. It is not up to the Mr. Pettit to prove that he is innocent.

---

[1] *United States v. Headspeth*, 852 F.2d 753, 757 (4th Cir. 1988).

## DEFENSE PROPOSED INSTRUCTION NO. 7

### Credibility of Witnesses – Law Enforcement Officer

You have heard the testimony of (a) law enforcement officer(s). The fact that a witness is employed as a law enforcement officer does not mean that their testimony necessarily deserves more or less consideration or greater or lesser weight than that of any other witness.

I am instructing you that you are to weigh the testimony of a police officer the same as you weigh the testimony of any other witnesses. You are not to apply any more or any less credibility to a police officer's testimony just because that person is a police officer.

You must decide, after reviewing all the evidence, whether you believe the testimony of the law enforcement witness and how much weight, if any, it deserves.[2]

---

[2] *Mod. Crim. Jury Instr. 3rd Cir.* 4.18; *see also United States v. Amerson*, 938 F.2d 116 (8th Cir. 1991) (When case turns on credibility of law enforcement officers, district court has responsibility to ensure jurors are not predisposed to believe testimony of the officers is inherently more credible than that of other witnesses.).

**DEFENSE PROPOSED INSTRUCTIONS NO. 8-9**

**Instructions as to each count in the indictment**

I will now explain the instructions for each count charged in the indictment. After reviewing each count, I will provide definitions for certain terms appearing in one or both counts.

**DEFENSE PROPOSED INSTRUCTION NO. 8 (COUNT I)**

**26 U.S.C. § 5861(d) – Receipt and Possession of a Grenade**

Mr. Pettit is charged in Count One of the Bill of Indictment with violating Title 25, United States Code, Section 5861(d), which reads in pertinent part as follows:

On or about July 23, 2025, in Buncombe County, within the Western District of North Carolina and elsewhere, Gregory Lee Pettit, knowingly received and possessed a firearm, that being a destructive device in the form of the grenade, not registered to him in the National Firearms and Transfer Record.

**26 U.S.C. § 5861(d) – Receipt and Possession of a Grenade**

In order for you to find Mr. Petit guilty of the offense charged in Count I, the government must prove each of the following essential elements beyond a reasonable doubt:

1. Mr. Petitt knowingly received and possessed the device charged in Count I of the indictment:[3]

   a. On or about July 23, 2025;[4]

   b. Within the Western District of North Carolina;[5]

2. On or about July 23, 2025, the device was a "destructive device" as defined in 26 U.S.C. § 5845. In order to prove that the device was a "destructive device" under the statute, the government must prove beyond a reasonable doubt that:

   a. The device was capable of explosion great enough to cause fragmentation of the device;[6]

   b. And that it was designed for use as a weapon;[7]

      i. If you find the device was redesigned, meaning changed in appearance structure or in the way it works from its original form,[8] the government must prove beyond a reasonable doubt that the device is now designed for use as a weapon;[9]

---

[3] 26 U.S.C. 5861(d).

[4] Count I of the indictment. Dkt. No. 12.

[5] *Id.*

[6] "It is beyond dispute that a certain minimum level of powder would be needed to transform an unarmed grenade into an "explosive grenade."" *United States v. Blackburn*, 940 F.2d 107, 109 (4th Cir. 1991) *(citing United States v. One 1972 Chevrolet El Camino Pickup Truck,* 369 F.Supp. 755 (D.Neb. 1973) (fully assembled practice grenade with enough powder to produce a loud "pop", but not enough to cause fragmentation, held not to be a "destructive device")). *See also United States v. Hamrick*, 995 F.2d 1267, 1271 (4th Cir. 1993) (accepting defendant's argument that "a combination of parts would only be a destructive device if, in its present condition, it was capable of detonating.").

[7] 26 U.S.C. § 5845(f).

[8] "Redesigned" Cambridge Dictionary https://dictionary.cambridge.org/dictionary/english/redesigned.

[9] *Id.*

ii. If you find that the device was originally designed as a weapon but later redesigned, the government must prove beyond a reasonable doubt that, in its current state, the device is **not** intended for use as a signaling, pyrotechnic, line throwing, safety, or some other similar device;[10]

The government must also prove that:

3. On July 23, 2025, Mr. Pettit knew the features of the device brought it within the statutory meaning of a "grenade;"[11] and

4. Mr. Pettit did not register the device with the National Firearms Registration and Transfer Record.

## Concluding Instructions for Count I

Therefore, members of the jury, I charge you that if you find from the evidence beyond a reasonable doubt that at the time and place described in the indictment, Mr. Pettit knowingly received and possessed a grenade which was a destructive device, that the device was capable of an explosion sufficient to cause it to fragment, that it was designed for use as a weapon, and that Mr. Pettit knew the elements of the device that made it a destructive device, it would be your duty to return a verdict of guilty as charged on Count I.

If you do not so find, however, or if you have a reasonable doubt as to one or more of the essential elements of the crime charged, it would be your duty to give the Mr. Pettit the benefit of the doubt and return a verdict of not guilty on Count I.

---

[10] *Id.*

[11] *See United States v. Staples*, 511 U.S. 600, 619 (1994); *see also United States v. Adamiak*, 2025 WL 2911117, *2 (4th Cir. October 14, 2025) (unpublished) (26 U.S.C. § 5861(d) "makes it "unlawful for any person to" (1) "receive or possess" (2) "a firearm" (3) "which is not registered to him in the National Firearms Registration or Transfer record" with (4) knowledge that the features of the relevant firearm "brought it within the scope of the Act." (quoting *Staples*, 511 U.S. at 619)).

**DEFENSE PROPOSED INSTRUCTION NO. 9 (COUNT I)**

**18 U.S.C. § 922(g)(3) – Firearm possession by a person who is an unlawful user of and addicted to a controlled substance**

Mr. Pettit is charged in Count Two of the Bill of Indictment with violating Title 18, United States Code, Section 922(g)(3), which reads in pertinent part as follows:

On or about July 23, 2025, in Buncombe County, within the Western District of North Carolina and elsewhere, Gregory Lee Pettit, knowing that he was an unlawful user of an addicted to a controlled substance, did knowingly possess a firearm, that is, an RG Industries, Model RG23, 22 caliber revolver, in and affecting commerce.

**Essential Elements**

**18 U.S.C. § 922(g)(3) – Firearm possession by a person who is an unlawful user of and addicted to a controlled substance**

In order for you to find Mr. Pettit guilt of the offense charged in Count II, the government must prove each of the following essential elements beyond a reasonable doubt:

1.  Mr. Pettit knowingly possessed a firearm:

    a.  On or about July 2023, 2025;

    b.  Within the Western District of North Carolina.

    c.  And that the firearm was an RG Industries, Model RG23, 22 caliber revolver;

2.  On or about July 2023, 2025, Mr. Pettit was an unlawful drug user and addicted to a controlled substance.

    a.  In order to prove that Mr. Pettit was an "unlawful user," the government must prove each of the three things beyond a reasonable doubt:

        i.   Mr. Pettit took a controlled substance with regularity; [12]

        ii.  Mr. Pettit took a controlled substance over an extended period of time;[13]

        iii. And that Mr. Pettit's use of a controlled substance was contemporaneous with his purchase or possession of a firearm.[14]

        iv.  Contemporaneous use, alone, however, is insufficient to make someone an "unlawful user" under the statute.[15]

        v.   If the government fails to prove any of these three factors (i-iii), you cannot find that Mr. Pettit was an "unlawful user" of a controlled substance.

---

[12] *United States v. Claybrooks*, 90 F.4th 248, 253 (4th Cir. 2024) (citation omitted).
[13] *Id.*
[14] *Id.*
[15] *Id.* at 254.

14

    b.  In order to prove Mr. Pettit was "addicted to" a controlled substance, the government must prove Mr. Pettit exhibited a compulsive, chronic, physiological or psychological need for a controlled substance on June 23, 2025.[16]

The government must also prove beyond a reasonable doubt that:

    3.  On or about June 23, 2025, Mr. Pettit knew of his status as an unlawful user and a person addicted to a controlled substance.[17]

The law instructs that you may consider evidence that Mr. Pettit sought treatment, took efforts to cease using a controlled substance, or overcame his addiction as evidence that negates any evidence that Mr. Pettit was an unlawful user or addicted to a controlled substance or that he knew he was an unlawful user or addicted to a controlled substance.[18]

Additionally, the law recognizes that someone who unlawfully uses or is addicted to a controlled substance may cease the use or addiction. Where they do, they may, again, possess a firearm. Therefore, the statute charged in Count II only applies to persons who are *currently* unlawful users or addicts. This means, if you find that Mr. Pettit was an unlawful user of and addicted to a controlled substance at some time in the past but further find that he did not fall within those definitions on or about June 23, 2025, you must find him not guilty.[19]

---

[16] "Addict", Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/addict.

[17] *Rehaif v. United States*, 588 U.S. 225, 237, 139 S. Ct. 2191, 2200, 204 L. Ed. 2d 594 (2019) ("We conclude that in a prosecution under 18 U.S.C. § 922(g) and § 924(a)(2), the Government must prove both that the defendant knew he possessed a firearm and that he knew he belonged to the relevant category of persons barred from possessing a firearm."); *accord United States v. Dempster*, No. CR PJM 14-0024, 2022 WL 486791, at *1 (D. Md. Feb. 17, 2022).

[18] *Claybrooks*, 90 F.4th at 253–54 (Claybrook's failure to "offer[ ] … evidence that he ever sought treatment for drug addiction or took efforts to cease using the controlled substance, [or] … indicate that he had overcome the addiction" left him within the meaning of an "unlawful drug user").

[19] *United States v. Carter*, 669 F.3d 411, 419 (4th Cir. 2012) (citing *United States v. Yancey*, 621 F.3d 681, 696 (7th Cir. 2010) (Those falling within the ambit of § 922(g)(3) "could regain [their] right to possess a firearm by simply ending [their] drug abuse.")).

## Concluding Instructions for Count II

Therefore, members of the jury, I charge you that if you find from the evidence beyond a reasonable doubt that at the time and place described in the indictment, Mr. Pettit knowingly possessed a firearm and that firearm was an RG Industries, Model RG23, 22 caliber revolver, that the firearm was in interstate commerce, that at that time and place in the indictment Mr. Pettit was an unlawful user and addicted to a controlled substance, and that Mr. Pettit knew he was an unlawful user and addicted to a controlled substance as defined by law, it would be your duty to return a verdict of guilty as charged in Count II.

If you do not so find, however, or if you have a reasonable doubt as to one or more of the essential elements of the crime charged, it would be your duty to give the Mr. Pettit the benefit of the doubt and return a verdict of not guilty on Count II.

## Transition to Definitions

I shall now define certain terms used in the essential elements of Counts I and II. You are to apply these definitions as you consider the evidence. If I do not define certain words, you will assign them their ordinary, everyday meanings.

## "Contemporaneous" Defined

The term "contemporaneous" means at the same time.[20]

## "Controlled Substance" Defined

The term "controlled substance" means a drug or other substance, or immediate precursor, included in schedule I, II, III, IV, or V of the Controlled Substances Act. To assist your deliberations, the Court has included a chart of the relevant drug schedule in the attached document titled "**Federal Drug Schedule**." The term "controlled substance" does not include distilled spirits, wine, malt beverages, or tobacco.[21]

## "Firearm" Defined

The term "firearm" means any weapon which will or is designed to or may readily be converted to expel a projectile by the action of an explosive, even if such weapon has previously been rendered inoperable; the frame or receiver of any such weapon; any firearm muffler or firearm silencer; or any destructive device. The term firearm does not include an antique firearm.

---

[20] "Contemporaneous," Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/contemporaneous.
[21] 21 U.S.C. § 802(6).

### "In Interstate Commerce" Defined

The phrase "in interstate commerce" means any commerce that traveled from any place in one state to any place outside of that state.

### "Knowingly" Defined

The term "knowingly," as used in these instructions to describe the alleged state of mind of Mr. Pettit, means that he acted voluntarily and intentionally and not because of ignorance, mistake, or accident.

### "Possession" Defined

The law recognizes several kinds of possession. A person may have actual or constructive possession. A person may have sole or joint possession.

"Actual possession" occurs when a person knowingly has direct physical control or authority over something. "Constructive possession" occurs when a person does not have direct physical control over something but can knowingly control it and intends to control it, sometimes through another person.

If one person alone has actual or constructive possession of an item, possession is sole. If two or more persons share actual or constructive possession of an item, possession is joint.

Merely being present where an item is located, however, does not equal possession. The Government must prove that Mr. Pettit knowingly had actual or constructive possession of any of the firearms and/or ammunition described in the indictment, in order for you to find him guilty of the offense.

# Federal Drug Schedule

## Schedule I

(a) Unless specifically excepted or unless listed in another schedule, any of the following opiates, including their isomers, esters, ethers, salts, and salts of isomers, esters, and ethers, whenever the existence of such isomers, esters, ethers, and salts is possible within the specific chemical designation:

(1) Acetylmethadol.

(2) Allylprodine.

(3) Alphacetylmathadol.

(4) Alphameprodine.

(5) Alphamethadol.

(6) Benzethidine.

(7) Betacetylmethadol.

(8) Betameprodine.

(9) Betamethadol.

(10) Betaprodine.

(11) Clonitazene.

(12) Dextromoramide.

(13) Dextrorphan.

(14) Diampromide.

(15) Diethylthiambutene.

(16) Dimenoxadol.

(17) Dimepheptanol.

(18) Dimethylthiambutene.

(19) Dioxaphetyl butyrate.

(20) Dipipanone.

(21) Ethylmethylthiambutene.

(22) Etonitazene.

(23) Etoxeridine.

(24) Furethidine.

(25) Hydroxypethidine.

(26) Ketobemidone.

(27) Levomoramide.

(28) Levophenacylmorphan.

(29) Morpheridine.

(30) Noracymethadol.

(31) Norlevorphanol.

(32) Normethadone.

(33) Norpipanone.

(34) Phenadoxone.

(35) Phenampromide.

(36) Phenomorphan.

(37) Phenoperidine.

(38) Piritramide.

(39) Proheptazine.

(40) Properidine.

(41) Racemoramide.

(42) Trimeperidine.

(b) Unless specifically excepted or unless listed in another schedule, any of the following opium derivatives, their salts, isomers, and salts of isomers whenever the existence of such salts, isomers, and salts of isomers is possible within the specific chemical designation:

(1) Acetorphine.

(2) Acetyldihydrocodeine.

(3) Benzylmorphine.

(4) Codeine methylbromide.

(5) Codeine-N-Oxide.

(6) Cyprenorphine.

(7) Desomorphine.

(8) Dihydromorphine.

(9) Etorphine.

(10) Heroin.

(11) Hydromorphinol.

(12) Methyldesorphine.

(13) Methylhydromorphine.

(14) Morphine methylbromide.

(15) Morphine methylsulfonate.

(16) Morphine-N-Oxide.

(17) Myrophine.

(18) Nicocodeine.

(19) Nicomorphine.

(20) Normorphine.

(21) Pholcodine.

(22) Thebacon.

(c) Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation, which contains any quantity of the following hallucinogenic substances, or which contains any of their salts, isomers, and salts of isomers whenever the existence of such salts, isomers, and salts of isomers is possible within the specific chemical designation:

(1) 3,4-methylenedioxy amphetamine.

(2) 5-methoxy-3,4-methylenedioxy amphetamine.

(3) 3,4,5-trimethoxy amphetamine.

(4) Bufotenine.

(5) Diethyltryptamine.

(6) Dimethyltryptamine.

(7) 4-methyl-2,5-dimethoxyamphetamine.

(8) Ibogaine.

(9) Lysergic acid diethylamide.

(10) Marihuana.

(11) Mescaline.

(12) Peyote.

(13) N-ethyl-3-piperidyl benzilate.

(14) N-methyl-3-piperidyl benzilate.

(15) Psilocybin.

(16) Psilocyn.

(17) Tetrahydrocannabinols, except for tetrahydrocannabinols in hemp

(18) 4-methylmethcathinone (Mephedrone).

(19) 3,4-methylenedioxypyrovalerone (MDPV).

(20) 2-(2,5-Dimethoxy-4-ethylphenyl)ethanamine (2C-E).

(21) 2-(2,5-Dimethoxy-4-methylphenyl)ethanamine (2C-D).

(22) 2-(4-Chloro-2,5-dimethoxyphenyl)ethanamine (2C-C).

(23) 2-(4-Iodo-2,5-dimethoxyphenyl)ethanamine (2C-I).

(24) 2-[4-(Ethylthio)-2,5-dimethoxyphenyl]ethanamine (2C-T-2).

(25) 2-[4-(Isopropylthio)-2,5-dimethoxyphenyl]ethanamine (2C-T-4).

(26) 2-(2,5-Dimethoxyphenyl)ethanamine (2C-H).

(27) 2-(2,5-Dimethoxy-4-nitro-phenyl)ethanamine (2C-N).

(28) 2-(2,5-Dimethoxy-4-(n)-propylphenyl)ethanamine (2C-P).

(d)(1) Unless specifically exempted or unless listed in another schedule, any material, compound, mixture, or preparation which contains any quantity of cannabimimetic agents, or which contains their salts, isomers, and salts of isomers whenever the existence of such salts, isomers, and salts of isomers is possible within the specific chemical designation.

(2) In paragraph (1):

(A) The term "cannabimimetic agents" means any substance that is a cannabinoid receptor type 1 (CB1 receptor) agonist as demonstrated by binding studies and functional assays within any of the following structural classes:

(i) 2-(3-hydroxycyclohexyl)phenol with substitution at the 5-position of the phenolic ring by alkyl or alkenyl, whether or not substituted on the cyclohexyl ring to any extent.

(ii) 3-(1-naphthoyl)indole or 3-(1-naphthylmethane)indole by substitution at the nitrogen atom of the indole ring, whether or not further substituted on the indole ring to any extent, whether or not substituted on the naphthoyl or naphthyl ring to any extent.

(iii) 3-(1-naphthoyl)pyrrole by substitution at the nitrogen atom of the pyrrole ring, whether or not further substituted in the pyrrole ring to any extent, whether or not substituted on the naphthoyl ring to any extent.

(iv) 1-(1-naphthylmethylene)indene by substitution of the 3-position of the indene ring, whether or not further substituted in the indene ring to any extent, whether or not substituted on the naphthyl ring to any extent.

(v) 3-phenylacetylindole or 3-benzoylindole by substitution at the nitrogen atom of the indole ring, whether or not further substituted in the indole ring to any extent, whether or not substituted on the phenyl ring to any extent.

(B) Such term includes--

(i) 5-(1,1-dimethylheptyl)-2-[(1R,3S)-3-hydroxycyclohexyl]-phenol (CP-47,497);

(ii) 5-(1,1-dimethyloctyl)-2-[(1R,3S)-3-hydroxycyclohexyl]-phenol (cannabicyclohexanol or CP-47,497 C8-homolog);

(iii) 1-pentyl-3-(1-naphthoyl)indole (JWH-018 and AM678);

(iv) 1-butyl-3-(1-naphthoyl)indole (JWH-073);

(v) 1-hexyl-3-(1-naphthoyl)indole (JWH-019);

(vi) 1-[2-(4-morpholinyl)ethyl]-3-(1-naphthoyl)indole (JWH-200);

(vii) 1-pentyl-3-(2-methoxyphenylacetyl)indole (JWH-250);

(viii) 1-pentyl-3-[1-(4-methoxynaphthoyl)]indole (JWH-081);

(ix) 1-pentyl-3-(4-methyl-1-naphthoyl)indole (JWH-122);

(x) 1-pentyl-3-(4-chloro-1-naphthoyl)indole (JWH-398);

(xi) 1-(5-fluoropentyl)-3-(1-naphthoyl)indole (AM2201);

(xii) 1-(5-fluoropentyl)-3-(2-iodobenzoyl)indole (AM694);

(xiii) 1-pentyl-3-[(4-methoxy)-benzoyl]indole (SR-19 and RCS-4);

(xiv) 1-cyclohexylethyl-3-(2-methoxyphenylacetyl)indole (SR-18 and RCS-8); and

(xv) 1-pentyl-3-(2-chlorophenylacetyl)indole (JWH-203).

(e)(1) Unless specifically exempted or unless listed in another schedule, any material, compound, mixture, or preparation which contains any quantity of a fentanyl-related substance, or which contains the salts, isomers, and salts of isomers of a fentanyl-related substance whenever the existence of such salts, isomers, and salts of isomers is possible within the specific chemical designation.

(2) For purposes of paragraph (1), except as provided in paragraph (3), the term "fentanyl-related substance" means any substance that is structurally related to fentanyl by 1 or more of the following modifications:

(A) By replacement of the phenyl portion of the phenethyl group by any monocycle, whether or not further substituted in or on the monocycle.

(B) By substitution in or on the phenethyl group with alkyl, alkenyl, alkoxyl, hydroxyl, halo, haloalkyl, amino, or nitro groups.

(C) By substitution in or on the piperidine ring with alkyl, alkenyl, alkoxyl, ester, ether, hydroxyl, halo, haloalkyl, amino, or nitro groups.

(D) By replacement of the aniline ring with any aromatic monocycle whether or not further substituted in or on the aromatic monocycle.

(E) By replacement of the N-propionyl group with another acyl group.

(3) A substance that satisfies the definition of the term "fentanyl-related substance" in paragraph (2) shall nonetheless not be treated as a fentanyl-related substance subject to this schedule if the substance--

(A) is controlled by action of the Attorney General under section 811 of this title; or

(B) is otherwise expressly listed in a schedule other than this schedule.

(4)(A) The Attorney General may by order publish in the Federal Register a list of substances that satisfy the definition of the term "fentanyl-related substance" in paragraph (2).

(B) The absence of a substance from a list published under subparagraph (A) does not negate the control status of the substance under this schedule if the substance satisfies the definition of the term "fentanyl-related substance" in paragraph (2).

23

**Schedule II**

(a) Unless specifically excepted or unless listed in another schedule, any of the following substances whether produced directly or indirectly by extraction from substances of vegetable origin, or independently by means of chemical synthesis, or by a combination of extraction and chemical synthesis:

(1) Opium and opiate, and any salt, compound, derivative, or preparation of opium or opiate.

(2) Any salt, compound, derivative, or preparation thereof which is chemically equivalent or identical with any of the substances referred to in clause (1), except that these substances shall not include the isoquinoline alkaloids of opium.

(3) Opium poppy and poppy straw.

(4) coca leaves, except coca leaves and extracts of coca leaves from which cocaine, ecgonine, and derivatives of ecgonine or their salts have been removed; cocaine, its salts, optical and geometric isomers, and salts of isomers; ecgonine, its derivatives, their salts, isomers, and salts of isomers; or any compound, mixture, or preparation which contains any quantity of any of the substances referred to in this paragraph.

(b) Unless specifically excepted or unless listed in another schedule, any of the following opiates, including their isomers, esters, ethers, salts, and salts of isomers, esters and ethers, whenever the existence of such isomers, esters, ethers, and salts is possible within the specific chemical designation:

(1) Alphaprodine.

(2) Anileridine.

(3) Bezitramide.

(4) Dihydrocodeine.

(5) Diphenoxylate.

(6) Fentanyl.

(7) Isomethadone.

(8) Levomethorphan.

(9) Levorphanol.

(10) Metazocine.

(11) Methadone.

(12) Methadone-Intermediate, 4-cyano-2-dimethylamino-4, 4-diphenyl butane.

24

(13) Moramide-Intermediate, 2-methyl-3-morpholino-1, 1-diphenylpropane-carboxylic acid.

(14) Pethidine.

(15) Pethidine-Intermediate-A, 4-cyano-1-methyl-4-phenylpiperidine.

(16) Pethidine-Intermediate-B, ethyl-4-phenylpiperidine-4-carboxylate.

(17) Pethidine-Intermediate-C, 1-methyl-4-phenylpiperidine-4-carboxylic acid.

(18) Phenazocine.

(19) Piminodine.

(20) Racemethorphan.

(21) Racemorphan.

(c) Unless specifically excepted or unless listed in another schedule, any injectable liquid which contains any quantity of methamphetamine, including its salts, isomers, and salts of isomers.

## Schedule III

(a) Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation which contains any quantity of the following substances having a stimulant effect on the central nervous system:

(1) Amphetamine, its salts, optical isomers, and salts of its optical isomers.

(2) Phenmetrazine and its salts.

(3) Any substance (except an injectable liquid) which contains any quantity of methamphetamine, including its salts, isomers, and salts of isomers.

(4) Methylphenidate.

(b) Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation which contains any quantity of the following substances having a depressant effect on the central nervous system:

(1) Any substance which contains any quantity of a derivative of barbituric acid, or any salt of a derivative of barbituric acid.

(2) Chorhexadol.

(3) Glutethimide.

(4) Lysergic acid.

(5) Lysergic acid amide.

(6) Methyprylon.

(7) Phencyclidine.

(8) Sulfondiethylmethane.

(9) Sulfonethylmethane.

(10) Sulfonmethane.

(c) Nalorphine.

(d) Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation containing limited quantities of any of the following narcotic drugs, or any salts thereof:

(1) Not more than 1.8 grams of codeine per 100 milliliters or not more than 90 milligrams per dosage unit, with an equal or greater quantity of an isoquinoline alkaloid of opium.

(2) Not more than 1.8 grams of codeine per 100 milliliters or not more than 90 milligrams per dosage unit, with one or more active, non-narcotic ingredients in recognized therapeutic amounts.

(3) Not more than 300 milligrams of dihydrocodeinone per 100 milliliters or not more than 15 milligrams per dosage unit, with a fourfold or greater quantity of an isoquinoline alkaloid of opium.

(4) Not more than 300 milligrams of dihydrocodeinone per 100 milliliters or not more than 15 milligrams per dosage unit, with one or more active, nonnarcotic ingredients in recognized therapeutic amounts.

(5) Not more than 1.8 grams of dihydrocodeine per 100 milliliters or not more than 90 milligrams per dosage unit, with one or more active, nonnarcotic ingredients in recognized therapeutic amounts.

(6) Not more than 300 milligrams of ethylmorphine per 100 milliliters or not more than 15 milligrams per dosage unit, with one or more active, nonnarcotic ingredients in recognized therapeutic amounts.

(7) Not more than 500 milligrams of opium per 100 milliliters or per 100 grams, or not more than 25 milligrams per dosage unit, with one or more active, nonnarcotic ingredients in recognized therapeutic amounts.

(8) Not more than 50 milligrams of morphine per 100 milliliters or per 100 grams with one or more active, nonnarcotic ingredients in recognized therapeutic amounts.

(e) Anabolic steroids.

**Schedule IV**

(1) Barbital.

(2) Chloral betaine.

(3) Chloral hydrate.

(4) Ethchlorvynol.

(5) Ethinamate.

(6) Methohexital.

(7) Meprobamate.

(8) Methylphenobarbital.

(9) Paraldehyde.

(10) Petrichloral.

(11) Phenobarbital.

**Schedule V**

Any compound, mixture, or preparation containing any of the following limited quantities of narcotic drugs, which shall include one or more nonnarcotic active medicinal ingredients in sufficient proportion to confer upon the compound, mixture, or preparation valuable medicinal qualities other than those possessed by the narcotic drug alone:

(1) Not more than 200 milligrams of codeine per 100 milliliters or per 100 grams.

(2) Not more than 100 milligrams of dihydrocodeine per 100 milliliters or per 100 grams.

(3) Not more than 100 milligrams of ethylmorphine per 100 milliliters or per 100 grams.

(4) Not more than 2.5 milligrams of diphenoxylate and not less than 25 micrograms of atropine sulfate per dosage unit.

(5) Not more than 100 milligrams of opium per 100 milliliters or per 100 grams.

---

## AI CERTIFICATION

Pursuant to the Standing Order of this Court entered June 18, 2024, and published to the Bar of the Western District on June 27, 2024, the undersigned hereby certifies:

1.      No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard online legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2.      Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

Date:  October 27, 2025                    s/**Rhett H. Johnson**
                                           Assistant Federal Public Defender

29