IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:25-cr-00058-MR-WCM

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | MEMORANDUM AND |
| | ) | RECOMMENDATION |
| GREGORY LEE PETTIT, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the Court on Defendant's "Motion to Suppress and Memorandum of Law" (the "Motion to Suppress," Doc. 17), which has been referred to the undersigned for the entry of a recommendation pursuant to 28 U.S.C. § 636.

## I.    Relevant Procedural Background

On July 28, 2025, a criminal complaint was filed charging Gregory Lee Pettit ("Defendant") with one count of possession of an unregistered destructive device, in violation of 26 U.S.C. § 5861(d). Doc. 1.

On July 31, 2025, Defendant made an initial appearance.

On August 5, 2025, a Bill of Indictment was filed charging Defendant with possession of an unregistered destructive device, in violation of 26 U.S.C. § 5861(d), and possession of a firearm by an unlawful user of a controlled substance, in violation of 18 U.S.C. § 922(g)(3). Doc. 12.

1

On August 15, 2025, Defendant was arraigned on the Bill of Indictment and entered a plea of not guilty.

On September 15, 2025, Defendant filed the Motion to Suppress. Doc. 17. The Government responded and Defendant replied. Docs. 25, 27.

The undersigned conducted a hearing on October 30, 2025. Assistant United States Attorney Alexis Solheim appeared for the Government. Defendant appeared with his attorney, Assistant Federal Public Defender Rhett Johnson.

At the conclusion of that hearing, the undersigned took the matter under advisement. This Memorandum now follows.

## II.    Factual Background

"When material facts that affect the resolution of a motion to suppress . . . are in conflict, the appropriate way to resolve the conflict is by holding an evidentiary hearing after which the district court will be in a position to make findings." United States v. Taylor, 13 F.3d 786, 789 (4th Cir. 1994). In doing so, the court determines "the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence." United States v. Gualtero, 62 F. Supp.3d 479, 482 (E.D. Va. 2014) (citing United States v. McKneely, 6 F.3d 1447, 1452-53 (10th Cir. 1993)).

## A. The Evidence Presented

During the October 30, 2025 hearing, the Government called the following personnel from the Buncombe County Sheriff's Office ("BCSO"): Sergeant Amanda Owensby, Deputy Austin Pittman, Corporal Michael Shirley, and Deputy Kevin Lane. The Government also called Special Agent Tyler Billings of the Bureau of Alcohol, Tobacco, Firearms, and Explosives. Defendant did not call any witnesses.

Additionally, the Court received body worn camera ("BWC") footage of Sergeant Owensby, Deputy Pittman, Corporal Shirley, Deputy Lane, and Deputy Donati; dash camera footage from Sergeant Owensby's vehicle; Defendant's State of North Carolina arrest warrants; a State of North Carolina search warrant (and related materials) for Defendant's vehicle; an affidavit from Defendant's mother; a copy of the BCSO's tow inventory policy; a copy of the Tow/Inventory Report from the night of Defendant's arrest; and a DEA drug lab testing report.[1]

## B. Factual Findings

Based on the evidence of record and as presented during the hearing, the undersigned makes the following findings of fact:

---

[1] Some exhibits were duplicative. In addition, certain exhibits were submitted in advance of the hearing, while others were presented during the hearing.

On July 23, 2025, at about 12:20am, BCSO officers were dispatched to 4 Needles Lane in Candler, North Carolina in response to a 911 call. The dispatcher advised that a male subject was attempting to break into a home while armed with a knife and a firearm. The dispatcher also advised that the suspect was intoxicated. The 911 caller identified the suspect as being Gregory Pettit, and said he fled the scene in a Ford Expedition.[2]

At about 12:27am, Sergeant Owensby saw headlights that appeared to match a Ford Expedition. She attempted to stop the vehicle but the driver did not stop and a pursuit began. Sergeant Owensby chased the Expedition for about 3 minutes at speeds exceeding 68mph.

Deputies Pittman and Lane joined the chase and set themselves up to deploy stop sticks.[3] Deputy Lane, using stop sticks, deflated two of the Expedition's tires, but the vehicle did not stop.

At about 12:30am, the vehicle came to a stop at 48 Oakdale Drive in Candler, North Carolina, which officers later learned was Defendant's mother's home. Officers ordered the driver out of the vehicle; Defendant emerged from the driver's side approximately six minutes later.

---

[2] A recording of the 911 call itself was not submitted. The information about its contents was provided through witness testimony.

[3] A stop stick is a device that can be thrown into the road to puncture a vehicle's tires and then removed from the road quickly.

Defendant was taken into custody at 12:36am and searched, at which time officers seized a "snuff bullet" from Defendant's pocket.[4] This device was identified on scene as being a pipe.[5] Defendant was handcuffed and placed in a patrol vehicle.

At about 12:38am, officers began to conduct what the Government refers to as a "safety sweep" of the Ford Expedition, which involved officers looking into the windows or opening the doors to scan the interior of the vehicle quickly. Deputy Pittman could not see into the back area of the vehicle because the rear windows were darkly tinted, so Deputy Donati opened the rear driver's side door to check that area. No other people were in the vehicle, but Deputy Donati encountered Defendant's dog in the rear hatch area and immediately closed the door.

---

[4] Defendant's Motion to Suppress does not challenge the seizure of the snuff bullet.

[5] Sergeant Owensby testified that the item appeared to be a pipe that "you could put tobacco in" or "any substance." The BWC footage reflects other officers calling the item a pipe, but none testified about having any knowledge of its contents. Special Agent Billings, who was not at the scene, testified that a snuff bullet can be used to inhale narcotics in powder form. He also testified that a small amount of crystal powder, which laboratory testing confirmed to be methamphetamine, was found inside the snuff bullet, though none of the officers on scene had that information at the time of Defendant's arrest. Consequently, the Court declines to give any weight to Special Agent Billings's testimony regarding the contents of the item in the context of the Motion to Suppress.

At about the same time, Deputy Pittman looked through the vehicle's front windows and saw a silver handgun in the front passenger seat.[6] Deputy Pittman testified that seeing the handgun confirmed the report that Defendant was armed during the attempted breaking and entering. Deputy Pittman retrieved the firearm, removed the magazine, and put the firearm in a plastic bag.[7]

At about 12:40am, Deputy Lane and Sergeant Owensby went to speak to Defendant's mother on the front porch of the residence. Sergeant Owensby asked for help in retrieving the dog from the back of the Expedition and then returned to the driveway,[8] while Deputy Lane remained with Defendant's mother. She proceeded to tell him that Defendant had prior felony arrests and she noted Defendant's past use and suspected current use of alcohol or other substances. She also stated that Defendant had been living in the Expedition and speculated that the uncharged firearm might be stolen. Deputy Lane told Defendant's mother that the Expedition would be seized and towed.

---

[6] The parties' briefing indicates that officers also observed a knife. Doc. 25 at 2; Doc. 27 at 5. Therefore, for purposes of this Memorandum, the undersigned assumes that both a firearm and a knife were on the front passenger seat.

[7] The Government advised that it was a privately made firearm. The firearm charge in the Bill of Indictment pertains to a separate firearm. The undersigned therefore refers to the firearm found in the front seat as the "uncharged firearm" for the remainder of this Memorandum.

[8] Ultimately, Defendant's stepfather retrieved the dog from Defendant's vehicle.

6

At about 12:59am (after Defendant's dog had been removed from the vehicle), officers began searching the Ford Expedition. During that search, they opened the doors and examined various areas throughout the vehicle, including the center console. Corporal Shirley instructed a trainee deputy to look for "anything you think is relevant to a crime." Although officers examined several pieces of clothing in the vehicle and inspected the contents of a backpack that was located on the rear passenger seat, which appeared to contain eyeglasses, shoes, clothes, and medication, none of those items were logged on the Tow/Storage Report that was later completed by Sergeant Owensby.

At about 1:03am, Defendant's mother told Deputy Pittman that, previously, Defendant had a grenade in the vehicle. Deputy Pittman conveyed that information to the officers searching the vehicle. Corporal Shirley had already searched the front passenger seat area and was in the process of searching the back seat area, but returned to the front passenger seat area and searched again. He looked into the center console and removed a plastic grocery bag that contained what he described as being a heavy pear-shaped item.

At 1:04am, Corporal Shirley set the item in the grass away from the vehicle. That item was later confirmed to be a hand grenade.

In light of this discovery, Sergeant Owensby called other police departments to inquire about assistance from a bomb squad. About 1.5-2 hours

7

later, the Henderson County Sheriff's Office bomb squad arrived and secured the grenade. While the bomb squad was en route, at least one deputy continued to search the Expedition and others remained near the vehicle.

Defendant was charged with fourteen (14) state law offenses, including fleeing to elude arrest with a motor vehicle, in violation of N.C. Gen. Stat. § 20-141.5(b), and attempted first degree burglary, in violation of N.C. Gen. Stat. § 14-51. See Doc. 27-2.[9]

Following the filing of those charges, a state search warrant was issued for the Ford Expedition. The statement of probable cause in support of the application for that warrant reported that a knife, a firearm (the uncharged firearm), and a hand grenade were located during an inventory search, and that bomb technicians had later confirmed that the grenade contained explosive materials.

A subsequent search conducted pursuant to the state search warrant resulted in the seizure of additional items, including a .22-caliber revolver.

---

[9] Additionally, Defendant was charged with driving while impaired in violation of N.C. Gen. Stat. § 20-138.1, failure to heed a light or siren in violation of N.C. Gen. Stat. § 20-157(A), cruelty to animals in violation of N.C. Gen. Stat. § 14-360(A), failure to stop at a stop sign in violation of N.C. Gen. Stat. § 20-158(B)(1)(3), resisting a public officer in violation of N.C. Gen. Stat. § 14-223, reckless driving in violation of N.C. Gen. Stat. § 20-140(A), speeding in violation of N.C. Gen. Stat. § 20-141(J1), and five counts of injury to personal property in violation of N.C. Gen. Stat. § 14-160.

8

### III.    Analysis

"As a general rule, the Fourth Amendment requires that law enforcement searches be accompanied by a warrant based on probable cause." United States v. Kolsuz, 890 F.3d 133, 137 (4th Cir. 2018). Warrantless searches, i.e., those "conducted outside the judicial process," without prior approval by a court, are *per se* unreasonable, subject only to a few well-established exceptions. Katz v. United States, 389 U.S. 347, 357 (1967); see also Kentucky v. King, 563 U.S. 452, 459-60 (2011); Minnesota v. Dickerson, 508 U.S. 366, 374 (1993).

In this case, the Government asserts that the search of Defendant's vehicle on July 23, 2025 was justified on multiple bases, which are discussed below.[10]

#### A. The Inventory Search Exception

"An inventory search is the search of property lawfully seized and detained, in order to ensure that it is harmless, to secure valuable items (such

---

[10] The indictment is based on Defendant's possession of the grenade and the .22-caliber revolver. Defendant argues that the grenade should be suppressed because it was unlawfully obtained, and that once information regarding the discovery of the grenade is removed from the affidavit submitted in support of the application for a search warrant, probable cause for the search warrant of the vehicle does not exist. Defendant therefore seeks to suppress both the grenade and the .22-caliber revolver but concedes that the search warrant is only invalid if the Court finds the previous warrantless searches of Defendant's vehicle were not supported by an exception to the warrant requirement. Doc. 27 at 7.

9

as might be kept in a towed car), and to protect against false claims of loss or damage." Whren v. United States, 517 U.S. 806, 811 n.1 (1996); see also United States v. Johnson, 492 F. App'x 437, 440 (4th Cir. 2012) ("Such searches serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger.") (internal quotation marks omitted).

"For the inventory search exception to apply, the search must have 'be[en] conducted according to standardized criteria,' such as a uniform police department policy, and performed in good faith." United States v. Matthews, 591 F.3d 230, 235 (4th Cir. 2009) (quoting Colorado v. Bertine, 479 U.S. 367, 374 n.6 (1987)) (alterations in Matthews) (internal citations omitted). Standardized criteria curtail "the discretion of the searching officer so as to prevent searches from becoming 'a ruse for a general rummaging in order to discover incriminating evidence.'" United States v. Banks, 482 F.3d 733, 739 (4th Cir. 2007) (quoting Florida v. Wells, 495 U.S. 1, 4 (1990)).

Here, the officers testified that they were familiar with the BCSO's inventory policy, the general purpose of which is to prevent claims of theft or loss by having any valuable items documented before a vehicle is moved to a tow yard or other facility. Officers also testified that while "items of value" are to be logged on the BCSO's Tow/Storage Report form, items are not necessarily required to be logged individually.

10

However, in this case, the search of the Expedition cannot be considered an inventory search; it was, instead, a general search for incriminating evidence.

Sergeant Owensby did complete a Tow/Storage Report form but listed no property whatsoever, despite the fact that BWC footage reflected the existence of multiple items in Defendant's vehicle, including eyeglasses, shoes, clothes, and medication.

Indeed, Corporal Shirley summed up the officers' purpose when he instructed a trainee to look for "anything you think is relevant to a crime."

While incriminating items may be lawfully seized during an inventory search, an inventory search may not serve as a pretext for a more general, investigative search. See Banks, 482 F.3d at 739; United States v. Johnson, TDC-16-135, 2017 WL 2256599, at *10 (D. Md. May 22, 2017) (concluding that the search of a vehicle was not a valid inventory search based on "indicia that the search was aimed at gathering evidence," including that the officer searched the car before issuing a citation, began the search without explaining that the search was for the purpose of documenting the vehicle's contents, was not prepared to document the contents of the vehicle, and only documented the incriminating items found in the car).

## B. The Automobile Exception

The Government also contends that there was probable cause to search Defendant's vehicle under the automobile exception, which provides that "officers may search a vehicle without a warrant if the vehicle 'is readily mobile and probable cause exists to believe it contains contraband or evidence of criminal activity.'" United States v. Graham, 686 F. App'x 166, 173 (4th Cir. 2017) (quoting United States v. Baker, 719 F.3d 313, 319 (4th Cir. 2013)).

First, the Government argues that Defendant's mother's statement about Defendant living in the Expedition and previously possessing a grenade in the same vehicle provided probable cause to support a warrantless search for the grenade.

Second, the Government asserts that the lawful seizure of the snuff bullet, when coupled with information received from dispatch and Defendant's mother about Defendant's possible intoxication as well as his driving behavior, supported a warrantless search for controlled substances.

In his reply, Defendant argues that his mother's statements regarding the grenade did not support a warrantless search pursuant to the automobile exception because Defendant's mother did not make those statements until *after* the officers had started searching the vehicle.

Similarly, Defendant argues that his mother's statement regarding Defendant's suspected intoxication did not support a warrantless search

because she only made that statement to one deputy and that deputy did not share the information with the other officers until *after* the search was underway.

The undersigned finds Defendant's position to be persuasive.

As an initial matter, it was not clear that the Expedition was readily mobile.

Further, as to probable cause, on the Government's first point, as discussed above, at the time Defendant's mother mentioned that a grenade had been in Defendant's vehicle, the search of the Expedition was already underway; the officers did not know of the possible existence of the grenade when they began their search. See Ornelas v. United States, 517 U.S. 690, 696 (1996) (defining probable cause as "existing where the *known* facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found") (emphasis added).

As to the Government's second point, the discovery of drug paraphernalia on the person of a recent occupant of a vehicle may, in certain circumstances, support probable cause to search the vehicle. See United States v. Baker, 719 F.3d 313, 319 (4th Cir. 2013) (upholding search of the passenger compartment of defendant's vehicle where officer found a gun, drugs, a large amount of cash, and a digital scale on defendant's person and explaining that probable cause exists to search a vehicle where "a police officer lawfully

searches a vehicle's recent occupant and finds contraband on his person")
(citing United States v. Johnson, 383 F.3d 538, 545 (7th Cir. 2004) (an officer's
"discovery of a banned substance (drugs ) on [the defendant's] person clearly
provided [the police officer] with probable cause to search the trunk of the
vehicle")); Wyoming v. Houghton, 526 U.S. 295, 300 (1999) (probable cause to
search the vehicle was uncontested where the officer noticed hypodermic
syringe in the driver's shirt pocket during a routine traffic stop and the driver
admitted using it to take drugs); Cooper v. Worsham, No. 4:07CV00032, 2007
WL 4106456, at *5 (W.D. Va. Nov. 19, 2007) (a police officer had probable cause
to search a vehicle "[w]here a driver has been found to have contraband on his
person[.]"); see also United States v. Runner, 43 F.4th 417, 422 (4th Cir. 2022)
("cases from this Circuit upholding plain view searches based on pipes and
paraphernalia have involved the presence of additional evidence or indicators
that contributed to a finding of probable cause.").

Here, however, it is not clear that the officers on scene identified the pipe
as being drug paraphernalia and the Government has not provided controlling
authority to support a finding that the presence of a single device that is found
on the person of a recent occupant of a vehicle but that is not identified by the
officers on scene as being drug paraphernalia, would, without more, provide
probable cause to search the arrestee's vehicle.

## C. Exigent Circumstances

The Fourth Circuit has explained that "the exigencies of the situation may render 'the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment.' The rationale underlying the exigent circumstances exception is a 'compelling need for official action and no time to secure a [search] warrant.'" <u>United States v. Curry</u>, 965 F.3d 313, 321 (4th Cir. 2020), as amended (July 16, 2020) (internal citations omitted).

Here, the Government argues that the possible presence of a grenade in Defendant's vehicle "generated exigent circumstances to search for it." Doc. 25 at 6.

In <u>United States v. Haldorson</u>, 941 F.3d 284, 293-94 (7th Cir. 2019), the Seventh Circuit approved a warrantless search of a defendant's bedroom after officers seized homemade pipe bombs from the defendant's vehicle, the defendant advised that additional explosives "could be" in his home, and "officers made the decision to enter [defendant's] locked bedroom to search for explosives because they were concerned for the safety of his roommate and the other residents and businesses." In doing so, the court noted that "[t]he exigent circumstances exception is 'frequently invoked in cases involving explosives" <u>Id</u>. at 295 (citing <u>United States v. Witzlib</u>, 796 F.3d 799, 802 (7th Cir. 2015)), and explained that "[e]xplosives are, by their very nature, inherently

dangerous. Homemade explosive devices even more so because the persons manufacturing them often lack the needed technical knowledge and skills." Id. The court concluded that the "officers reasonably believed that the homemade pipe bombs posed an immediate threat to public safety." Id. at 296.

Here, Defendant's mother did not indicate that Defendant had a homemade explosive device.

Further, the officers did not react in a way that indicated they believed there was an immediate threat to public safety. For example, they did not, after receiving the information from Defendant's mother, back away from Defendant's vehicle or attempt to establish a perimeter around the Expedition. Instead, Corporal Shirley began searching for the grenade, with other officers, and Defendant's mother, standing nearby. And then, after Corporal Shirley found what he believed to be the grenade, he proceeded to walk directly past Defendant's mother and place the object on the ground in the yard not very far away from Defendant's vehicle.

Under these circumstances, the undersigned is not persuaded that the exigent circumstances exception applies. See United States v. Yengel, 711 F.3d 392, 395 (4th Cir. 2013) (concluding that a warrantless search of defendant's closet was not justified under the exigent circumstances exception where an officer learned of the potential existence of a grenade and did not call for the assistance of explosive experts immediately or evaluate the area but instead

asked another occupant of the home to show him where the grenade was located, explaining that "[t]he presence of explosive materials must be tied to objective facts that sufficiently increase the likelihood, urgency, and magnitude of the threat to the level of an emergency," and finding "no clear error in the district court's factual finding that a grenade is a stable, inert explosive device that typically requires human intervention to detonate and cause harm.").

### D. Plain View

The Government's plain view argument fares a bit better.

Under the plain view doctrine, "if contraband is left in open view and is observed by a police officer from a lawful vantage point, there has been ... no 'search' within the meaning of the Fourth Amendment—or at least no search independent of the initial intrusion that gave the officers their vantage point." Minnesota v. Dickerson, 508 U.S. 366, 375 (1993). Three elements must be satisfied before law enforcement may seize an item that is in plain view: (1) the officer must not have violated the Fourth Amendment "in arriving at the place from which the evidence could be plainly viewed"; (2) the object's "incriminating character" must be "immediately apparent"; and (3) the officer must have "a lawful right of access to the object itself." Horton v. California, 496 U.S. 128, 136–37 (1990) (internal quotation marks and citations omitted).

Here, the Government contends that the officers properly seized the uncharged firearm and the knife because they were located in plain view in the front passenger seat of Defendant's vehicle and, in light of the report that Defendant was armed during his attempted breaking and entering earlier that night, the incriminatory nature of these items was apparent.

Defendant disagrees and asserts that neither item was relevant to any of the offenses for which Defendant was arrested on July 23, 2025.

The Supreme Court has noted that "the use of the phrase 'immediately apparent' was very likely an unhappy choice of words, since it can be taken to imply that an unduly high degree of certainty as to the incriminatory character of evidence is necessary for an application of the 'plain view' doctrine." Texas v. Brown, 460 U.S. 730, 741 (1983). An officer need not "'know' that certain items are contraband or evidence of a crime"; rather, the officer need only establish probable cause "'to associate the property with criminal activity.'" Id. (reaffirming "the rule, set forth in Payton v. New York, 445 U.S. 537, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), that '[t]he seizure of property in plain view involves no invocation of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity.'").

In that regard, "probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would 'warrant a man of reasonable caution in the belief,' that certain items may be contraband or

18

stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A 'practical, nontechnical' probability that incriminating evidence is involved is all that is required." Brown, 460 U.S. at 742.

Here, it was reasonable for the officers to associate the uncharged firearm and knife with criminal activity in light of the dispatcher's specific statement that the suspect was armed with a firearm and a knife during the commission of the attempted breaking and entering.

### E. Arizona v. Gant

Finally, the Government contends that the search of Defendant's vehicle was lawful pursuant to Arizona v. Gant, 556 U.S. 332, 351 (2009), in which the Supreme Court held that "[p]olice may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of arrest." Id. at 351; see also Davis v. United States, 564 U.S. 229, 235 (2011) (A search of an automobile incident to an arrest "is constitutional (1) if the arrestee is within reaching distance of the vehicle during the search, or (2) if the police have reason to believe that the vehicle contains 'evidence relevant to the crime of arrest.'") (quoting Gant, 556 U.S. at 343 (2009)).

19

Unlike the automobile exception discussed above, which permits a search for evidence of any crime (assuming there is probable cause), Gant's second exception allows officers to search only for evidence that is related to the crime(s) of arrest. See United States v. Baker, 719 F.3d 313, 319 (4th Cir. 2013) ("[I]n contrast to Gant's rule, [the automobile] exception permits police officers to search a vehicle for evidence of any crime, not just the crime of arrest, but *only* on a showing of probable cause rather than a mere reasonable belief.") (emphasis in Baker).

In this case, the Government contends that the second Gant exception applies[11] because the officers had a reasonable belief that Defendant's vehicle contained evidence of an offense of arrest, primarily attempted first degree burglary. See Doc. 25 at 3-4.

In response, Defendant points out that the possession of a weapon is not an element of any offense for which he was charged on July 23, 2025 and that, with respect to the attempted burglary, the officers were not advised that Defendant *used* a weapon "as he tried to 'break in' …only that he possessed a gun and knife." Doc. 27 at 5.

---

[11] The Government does not argue that the first Gant exception is applicable.

*Gant*, however, allows police to search a vehicle when it is "reasonable to believe that the vehicle contains evidence *relevant* to the offense of arrest." *Gant*, 556 U.S. at 351 (emphasis added).

Defendant has not cited authority indicating that *Gant*'s second exception only authorizes a search for evidence that would support the elements of the offense of arrest. Cf. United States v. McRae, No. 7:23-CR-74-FL, 2024 WL 4179162, at *10 (E.D.N.C. May 6, 2024) (explaining that courts look to "the nature of the offense for which a defendant is arrested to determine whether it was reasonable for officers to believe evidence related to the crime of arrest might be found in a vehicle."), report and recommendation adopted, No. 7:23-CR-74-FL, 2024 WL 3676303 (E.D.N.C. Aug. 5, 2024); Gant, 556 U.S. at 343-44 ("In many cases, as when a recent occupant is arrested for a traffic violation, there will be no reasonable basis to believe the vehicle contains relevant evidence. But in others ... the offense of arrest will supply a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein.").

Here, dispatch reported an attempted "breaking and entering" at 4 Needles Lane by an individual, identified as Gregory Pettit, who was armed with a gun and a knife and possibly intoxicated. Officers then observed Defendant flee in his vehicle from the direction of 4 Needles Lane. And of course, they then observed the uncharged firearm and knife in plain view.

21

Under these circumstances, it was reasonable for the officers to believe that Defendant's vehicle contained additional evidence (beyond the uncharged firearm and knife) that could be relevant to Defendant's alleged burglary. See United States v. Starkie, No. 5:13-CR-128-1-FL, 2013 WL 5742066, at *4 (E.D.N.C. Oct. 23, 2013), aff'd, 611 F. App'x 113 (4th Cir. 2015) ("In this case, because of defendant's clothing, defendant's having tried the door at an internet gambling business, the running vehicle with a person already in the driver's seat, and Officer Sawyer's belief that defendant has just discarded a gun, Officer Sawyer suspected defendant of attempting to commit robbery. Therefore, his search was permissible as a search for evidence of that attempted robbery."); Griffin v. Solomon, No. 1:15CV694, 2017 WL 3016826, at *11-12 (M.D.N.C. July 14, 2017), report and recommendation adopted, No. 1:15CV694, 2017 WL 10110376 (M.D.N.C. Sept. 13, 2017) (finding that the second Gant exception allowed officers to search petitioner's van where officers "heard [a] call go out that there was an attempted breaking and entering" and were informed that a red minivan had left the scene, and that following a stop of the van two eyewitnesses identified petitioner as the perpetrator); see also United States v. Singletary, No. 09-00058-01-CR-W-NKL, 2009 WL 3762912, at *5-*6 (W.D. Mo. Nov. 10, 2009) (search of defendant's car after defendant's arrest for bank robbery was permissible under Gant where it was reasonable to believe evidence relevant to the bank robbery could be located in the vehicle);

People v. Daniels, 891 N.Y.S.2d 815, 816 (N.Y. App. Div. 2009) (finding that a search of defendant's vehicle was justified pursuant to Gant where police located the defendant shortly after a robbery was reported, chased him, arrested him for attempted robbery, then searched his vehicle because it was reasonable to believe that evidence of the offense of arrest might be found in the vehicle).

## IV. Recommendation

Based on the foregoing, the undersigned respectfully **RECOMMENDS** that Defendant's Motion to Suppress (Doc. 17) be **DENIED.**

Signed: 11/26/2025

W. Carleton Metcalf
United States Magistrate Judge

## Time for Objections

The parties are hereby advised that, pursuant to Title 28, United States Code, Section 636(b)(1)(B), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same. **Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the presiding District Judge will preclude the parties from raising such objections on appeal. See Thomas v. Arn, 474 U.S. 140 (1985).