# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# ASHEVILLE DIVISION
# CRIMINAL CASE NO. 1:25-cr-00058-MR-WCM

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM OF** |
| vs. | ) | **DECISION AND ORDER** |
| | ) | |
| GREGORY LEE PETTIT, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the Defendant's Motion to Dismiss Count II of the Indictment [Doc. 18].

## I. PROCEDURAL BACKGROUND

On July 23, 2025, Gregory Lee Pettit (the "Defendant") was arrested by Buncombe County Sheriff's deputies after trying to force his way into a residence, fleeing from law enforcement, and resisting arrest. [See Case No. 1:25-mj-00027-WCM, Doc. 1: Complaint at 2]. On July 28, 2025, the Defendant was charged by way of a Criminal Complaint with possessing an "unregistered NFA destructive device," in violation of 26 U.S.C. § 5861(d). [Id. at 1]. The Defendant's initial appearance was held on July 31, 2025, at which time the Magistrate Judge appointed counsel for the Defendant. On

August 4, 2025, a detention hearing was held, and the Magistrate Judge ordered the Defendant detained.  [Case No. 1:25-mj-00027-WCM, Doc. 9].

On August 5, 2025, the Defendant was charged in a Bill of Indictment with one count of the § 5861(d) violation, and one count of possessing a firearm as an unlawful user of a controlled substance, in violation of 18 U.S.C. § 922(g)(3).  [Case No. 1:25-cr-00058-MR-WCM, Doc. 12: Indictment].  On August 5, 2025, the Criminal Complaint against the Defendant was terminated, and Case No. 1:25-mj-00027-WCM was closed.[1] On August 15, 2025, the Defendant's arraignment was held and the Defendant pled not guilty.  The Magistrate Judge scheduled his trial for September 2, 2025 and then, pursuant to 18 U.S.C. § 3161(c)(2), continued the trial until November 3, 2025.[2]  On September 15, 2025, the Defendant filed the present motion to dismiss.  [Doc. 18].  On October 17, 2025, the Government filed a response.  [Doc. 29].

## II.    FACTUAL BACKGROUND

On July 23, 2025, Buncombe County Sheriff's deputies responded to a 911 call from a residence in Candler, NC, that claimed that the Defendant

_____

[1] Per this District's usual practice, the Criminal Complaint was docketed as the first entry in Case No. 1:25-cr-00058-MR-WCM, even though the Bill of Indictment [Doc. 12] has become the operative charging document.

[2] On October 31, 2025, the Court granted the Government's motion to continue the trial date from the November 3, 2025 trial term.  [Doc. 34].

was "attempting to force his way into the residence" while "intoxicated" and "in possession of a firearm and a knife." [Case No. 1:25-mj-00027-WCM, Doc. 1: Complaint at 2]. Before the deputies arrived at the residence, the Defendant fled in a "dark-colored Ford Expedition." [Id.]. Down the road, another deputy located the Expedition. When he tried to pull the car over, however, it "fled at a high rate of speed." [Id.]. As the deputies pursued, they deployed stop sticks. The fleeing car drove over the sticks and two of its tires were "flattened." [Case No. 1:25-cr-00058-MR-WCM, Doc. 29 at 2]. Soon after, the car came to a stop at the Defendant's mother's residence. [Case No. 1:25-mj-00027-WCM, Doc. 1: Complaint at 2].

The Defendant was the only person in the car. The deputies ordered him out and took him into custody. [Id. at 2]. The deputies then conducted a "safety sweep" of the vehicle and discovered a revolver on the passenger seat. [Id. at 2-3]. They also discovered a "pipe" in the Defendant's pocket. As this went on, the Defendant's mother came outside, saying "he's probably drinking, he's probably on something," and warning the deputies that there might be a "hand grenade" inside the car. [Id. at 3-4]. The deputies identified a "round object inside of a white bag" inside the car and set it a safe distance away while waiting for the bomb squad. [Id. at 4]. Agents from the Bureau of Alcohol, Tobacco, Firearms and Explosives (the "ATF") later confirmed

that the object was a grenade.  [Id. at 5-6].  In addition to the firearm and the grenade, the deputies also discovered firearm parts, shell casings, rounds of ammunition, firearm magazines, and "unknown pills."  [Id. at 4-5].

Later that same day, Special Agent Tyler Billings of the ATF interviewed the Defendant's mother, stepfather, and ex-girlfriend.  [Id. at 7-8].  The Defendant's mother said that he started using drugs after he left the Navy around 2010.  [Id. at 7].  She stated that at one point he had a "$500.00 a day habit."  [Id. at 8].  She saw him "snorting cocaine" over a video call "about two months ago."  [Id. at 7].  She had also seen his grenade before and said that he "carries firearms often" and is "not scared to show you" his firearms.  [Id. at 7-8].  The Defendant's ex-girlfriend was also interviewed and said that she had seen him "use methamphetamine as recently as a couple months ago," and that she "still knows that he does it."  [Id. at 8].  She had also heard about his grenade.  [Id.].  She called him "destructive" and said he often talked about what he was "going to do to people."  [Id.].  She reported that he had even said to her on July 22, 2025, the day before his arrest, "I should fucking kill you."  [Id.].

After this conversation, Agent Billings procured a search warrant for the Defendant's car.  [Id.].  He discovered a revolver, ammunition, loaded

4

Case 1:25-cr-00058-MR-WCM    Document 39    Filed 12/10/25    Page 4 of 23

magazines, several cell phones, tire plugs, mail addressed to the Defendant, and a pistol holster. [Id. at 9].

The Defendant now moves to dismiss Count II of the Bill of Indictment on the grounds that § 922(g)(3) infringes his right to keep and bear arms under the Second Amendment both facially and as applied, and that the statute is unconstitutionally vague both facially and as applied. [Doc. 18 at 1]. The Government responded to his motion. [Doc. 29]. This matter is now ripe for disposition.

## III.  DISCUSSION

The Defendant argues that Count II of the Indictment, charging him with a violation of 18 U.S.C. § 922(g)(3), should be dismissed because § 922(g)(3) violates his Second Amendment right to keep and bear arms and his Fifth Amendment right not to be deprived of liberty without due process of law. [Doc. 18 at 1]. The Court will address each claim in turn.

### A.  Motion to Dismiss for Second Amendment Violations

The Defendant argues that § 922(g)(3), on its face and as applied to his circumstances, violates his right to keep and bear arms, as codified in the Second Amendment to the U.S. Constitution. [Id. at 2]. He claims that under New York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1 (2022),

the "government cannot meet its burden" to supply "evidence of founding era laws consistent with the 'how' and 'why' of § 922(g)(3)." [Id. at 5].

In Bruen, the Supreme Court "set forth a new framework under which courts must now analyze Second Amendment challenges." United States v. Price, 111 F.4th 392, 398 (4th Cir. 2024) (en banc). First, the court asks "whether the Second Amendment's plain text covers the conduct at issue." Id. Second, the court asks "whether the Government has justified the regulation as consistent with the principles that underpin our nation's historical tradition of firearm regulation." Id. (citation modified).

The Fourth Circuit has not yet applied the Bruen framework to § 922(g)(3).[3] It has, however, applied the pre-Bruen framework that developed

---

[3] Two recent Fourth Circuit decisions involved constitutional challenges to § 922(g)(3) but did not squarely address its constitutionality. First, in United States v. Claybrooks, 90 F.4th 248 (4th Cir. 2024), the defendant challenged the application of the "prohibited person" sentencing enhancement in U.S.S.G. § 2K2.1(a)(6), which rested on his status as an "unlawful drug user" under § 922(g)(3), by arguing that § 922(g)(3) violated the Second Amendment. 90 F.4th at 252-53, 255-56. But the defendant raised the constitutional challenge "for the first time on appeal," so the standard of review was "plain error." Id. at 256. The Fourth Circuit then held, without further analysis, that the challenge failed plain error review because "[t]his Circuit lacks precedent establishing that any of the relevant statues violate the Second Amendment right to keep and bear arms." Id. More recently, in United States v. Simmons, 143 F.4th 200 (4th Cir. 2025), the defendant challenged the application of the "prohibited person" enhancement in U.S.S.G. § 2K2.1(a)(4)(B)(ii)(I), which also rested on his status as an "unlawful drug user," by bringing a similar challenge to § 922(g)(3). 143 F.4th at 205-06. The Fourth Circuit held, however, that this "argument confuses the relationship between the two provisions," and that the defendant would "continue to be a 'prohibited person'" even if "§ 922(g)(3) is found to violate the Second Amendment." Id. at 206. Thus, in neither case did the Fourth Circuit address § 922(g)(3)'s constitutionality.

6

in the Circuit courts in the wake of <u>District of Colombia v. Heller</u>, 554 U.S. 570 (2008).  <u>See</u> <u>United States v. Carter</u>, 750 F.3d 462, 465-70 (4th Cir. 2014) (<u>Carter II</u>).  In <u>Carter II</u>, the Fourth Circuit held that § 922(g)(3) did not violate the Second Amendment.  <u>Id.</u> at 470.  Thus, the Court must first determine whether <u>Carter II</u> resolves the Defendant's Second Amendment challenge.

The Fourth Circuit has explained that some pre-<u>Bruen</u> decisions are abrogated by <u>Bruen</u> while others are not.  <u>United States v. Hunt</u>, 123 F.4th 697, 703-04 (4th Cir. 2024).  Since "<u>Bruen</u> rejected only one step of our former two-part test, the distinctions between different types of pre-<u>Bruen</u> decisions matters."  <u>Id.</u> at 704.  Decisions that "did not rely on any sort of 'means-end scrutiny,'" but instead "resolved the case at 'step one' of this Court's former test," are not abrogated by <u>Bruen</u>.  <u>Id.</u>  Thus, <u>Carter II</u> remains binding precedent only if it did not rely on "any sort of 'means-end scrutiny.'" <u>Id.</u>

<u>Carter II</u> was preceded by <u>United States v. Carter</u>, 669 F.3d 411 (4th Cir. 2012) (<u>Carter I</u>).  In <u>Carter I</u>, the defendant was indicted for violating § 922(g)(3) after police officers found marijuana and firearms in his apartment.  <u>Id.</u> at 413.  On appeal, the defendant argued that § 922(g)(3) infringed his right to keep and bear arms.  <u>Id.</u> at 414.  The Fourth Circuit described the old "two-step approach" it adopted after <u>Heller</u> as follows: "*First*, we inquire

7

whether the statute in question imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. And *second*, if the statute burdens such protected conduct, we apply an appropriate form of means-end scrutiny." Id. at 416 (citation modified). In Carter I, the court *assumed* that the defendant satisfied step one and proceeded straight to step two. Id. ("If we ultimately conclude that step two cannot be satisfied, we will need to address the government's argument under step one."). The court applied intermediate scrutiny and then concluded that "the government did not present sufficient evidence to substantiate the fit," because it "presented no empirical evidence or data." Id. at 420-21. The court remanded the case to allow the government to present empirical evidence. Id. at 421.

After the government presented additional empirical studies to the district court, the case returned to the Fourth Circuit in Carter II. 750 F.3d at 465. The Fourth Circuit then concluded that "empirical evidence and common sense support the government's contention that drug use, including marijuana use, frequently coincides with violence." Id. at 470. Because the government's new evidence met its burden under intermediate scrutiny, the Fourth Circuit upheld § 922(g)(3). Id.

Both Carter I and Carter II hinged entirely on means-end scrutiny. The case was remanded to allow the government to present new evidence so

that it could meet its burden under intermediate scrutiny. Only once it did so did the Fourth Circuit uphold § 922(g)(3). Therefore, Carter II was not a "step one" case, but entirely a "step two" case. As a result, according to Hunt, Bruen has abrogated Carter II. Thus, this Court must address the Defendant's constitutional challenge by applying the Bruen framework to § 922(g)(3).[4]

As relevant here, § 922(g)(3) makes it "unlawful for any person" "who is an unlawful user of or addicted to any controlled substance" to "possess in or affecting commerce, any firearm or ammunition." 18 U.S.C. § 922(g)(3). For a defendant to be an "unlawful user," the Government must prove that he "'took drugs with regularity, over an extended period of time, and contemporaneously with his purchase or possession of a firearm.'" United States v. Claybrooks, 90 F.4th 248, 253 (4th Cir. 2024) (quoting United States v. Purdy, 264 F.3d 809, 813 (9th Cir. 2001)). In short, § 922(g)(3) prohibits habitual drug users from possessing firearms.

---

[4] The Seventh Circuit recently used a similar analysis in United States v. Seiwert, 152 F.4th 854 (7th Cir. 2025), to address an identical constitutional challenge to § 922(g)(3). The government argued that a pre-Bruen, post-Heller case, United States v. Yancey, 621 F.3d 681 (7th Cir. 2010), resolved the question. 152 F.4th at 861. But the Seventh Circuit explained that "Yancey predated Bruen and applied the means-ends analysis that Bruen disavowed. Accordingly, we must take a fresh look employing Bruen's text-and-history framework." Id. (citation modified).

The Defendant has brought both a facial challenge and an as-applied challenge to § 922(g)(3). A facial challenge is "the 'most difficult challenge to mount successfully,' because it requires a defendant to 'establish that no set of circumstances exists under which the Act would be valid.'" United States v. Rahimi, 602 U.S. 680, 693 (2024) (quoting United States v. Salerno, 481 U.S. 739, 745 (1987)). To prevail, the Government "need only demonstrate that [§ 922(g)(3)] is constitutional in some of its applications." 602 U.S. at 693. Thus, before addressing the as-applied challenge, the Court will address the facial challenge and determine whether § 922(g)(3) can be applied to some set of circumstances without violating the Second Amendment.

### 1. The Bruen framework

#### a. Step One

The Second Amendment states, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. This language codifies the people's natural right to "possess and carry weapons in case of confrontation." Heller, 554 U.S. at 592. A two-step test determines when a regulation infringes this right: First, if "the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that

10

conduct." Bruen, 597 U.S. at 17. Second, the Government can rebut this presumption by demonstrating that "the regulation is consistent with this Nation's historical tradition of firearm regulation." Id. Step One is the plain text inquiry; Step Two is the historical inquiry. See United States v. Gould, 146 F.4th 421, 427 (4th Cir. 2025).

Step One resolves whether the challenged statute triggers the right to keep and bear arms at all. This plain text inquiry breaks down into three questions: whether the statute regulates members of "the people," whether it regulates attempts to "keep and bear," and whether it regulates "Arms." See Price, 111 F.4th at 400-01. If the answer to any of these questions is "no," the constitutional challenge ends there.

First, does § 922(g)(3) regulate "the people"? The Government argues that the Second Amendment only protects "law-abiding" citizens' right to keep and bear arms. [Doc. 29 at 7-8]. But in Heller, the Supreme Court concluded that "the people" includes "all members of the political community, not an unspecified subset." 554 U.S. at 580. And in Rahimi, the Court rejected the argument that citizens could be disarmed simply because they are not "responsible." 602 U.S. at 701-02. Thus, because § 922(g)(3)

applies to American citizens, "member[s] of the political community," it regulates "the people."[5]

Next, does § 922(g)(3) regulate "keep[ing] and bear[ing]"? To "keep arms" means to "possess[] arms"; to "bear arms" means to "carry[] weapons outside of an organized militia." Heller, 554 U.S. at 583-84. Section 922(g)(3) regulates, among other conduct, mere "possession" of a weapon. 18 U.S.C. § 922(g)(3). Bruen and Heller recognized that "keep[ing] and bear[ing]" includes possessing weapons in the home and in public. Bruen, 597 U.S. at 32-33. Thus, § 922(g)(3) regulates keeping and bearing.

The last question is whether § 922(g)(3) regulates "Arms." "Arms" are "weapons that were not specifically designed for military use and were not employed in a military capacity." Heller, 554 U.S. at 581. The term includes "all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." Id. at 582. By its terms, § 922(g)(3)

_____

[5] The Fourth Circuit has not decided whether it is permissible to resolve Second Amendment challenges by narrowing the definition of "the people." See United States v. Nutter, 137 F.4th 224, 230 (4th Cir. 2025). No Circuit, however, has resolved a constitutional challenge to § 922(g)(3) by narrowing the definition of "the people." United States v. Veasley, 98 F.4th 906, 910 (8th Cir. 2024); United States v. Connelly, 117 F.4th 269, 274 (5th Cir. 2024); United States v. Harris, 144 F.4th 154, 157 (3d Cir. 2025); United States v. VanOchten, 150 F.4th 552, 556 (6th Cir. 2025); Fla. Comm'r of Agric. v. Att'y Gen. of United States, 148 F.4th 1307, 1317-18 (11th Cir. 2025); United States v. Harrison, 153 F.4th 998, 1014-15 (10th Cir. 2025); United States v. Stennerson, 150 F.4th 1276, 1282 (9th Cir. 2025); Seiwert, 152 F.4th at 862. Thus, it seems wisest, and most in accord with Supreme Court precedent, to read "the people" as referring to "all Americans." Heller, 554 U.S. at 581.

applies to all "firearms," including, as in this case, handguns.  [See Case No. 1:25-mj-00027-WCM, Doc. 1: Complaint at 9].  Handguns are "the quintessential self-defense weapon," and, as such, are protected "Arms." Heller, 554 U.S. at 629.  Thus, § 922(g)(3) regulates "Arms."

### b.  Step Two

Because § 922(g)(3) regulates "the people" when they "keep and bear" "Arms," it is presumptively invalid.  Bruen, 597 U.S. at 17.  The Court now proceeds to Step Two, when the Government attempts to rebut this presumption through historical evidence.  To justify its statute, the Government must identify principles derived from our "Nation's historical tradition of firearm regulation" that are "relevantly similar" to the principles undergirding § 922(g)(3).  Id. at 17, 29.  To decide whether a historic regulation is relevantly similar to § 922(g)(3), the Court compares "how and why the regulations burden" the right to keep and bear arms.  Id. at 29.

Because the Constitution's "meaning is fixed according to the understandings of those who ratified it," the most important historical traditions are those present in 1791.[6]  Id. at 28.  But since "we must never

---

[6] This conclusion is based on the commonsense principle that "[w]ords must be given the meaning they had when the text was adopted."  Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 78 (2012).  For example, when Queen Anne called St. Paul's Cathedral "awful, artificial, and amusing," we would gravely misunderstand her if we injected our modern definitions into her words.  Id.  She meant

13

forget that it is a constitution we are expounding," a document "intended to endure for ages to come" and to be "adapted to the various crises of human affairs," McCulloch v. Maryland, 4 Wheat. 316, 407, 415 (1819) (emphasis deleted), the Government does not have to identify a "dead ringer" of a historical precursor. Bruen, 597 U.S. at 30. There is no reason to "assume[] that founding-era legislators *maximally* exercised their power to regulate." Rahimi, 602 U.S. at 739-40 (Barrett, J., concurring) (emphasis added). Thus, the Court must identify the "*principles* that underpin our regulatory tradition," Rahimi, 602 U.S. at 692 (majority) (emphasis added), not "historical twin[s]." Bruen, 597 U.S. at 30.

Now for the historical analysis. In Rahimi, the Supreme Court recognized a tradition that allows an individual to be "temporarily disarmed" if he is "found by a court to pose a credible threat to the physical safety of another." 602 U.S. at 702. Here, the Government offers evidence of a related tradition: laws that allow an individual to be temporarily disarmed if he is found by a court to fall within "categories of persons thought by a legislature to present a special danger of misuse." Id. at 698. The Government focuses on one category of persons in this tradition: habitual

---

that the architecture was "awe-inspiring, highly artistic, and thought-provoking," not hideous, fake, or laugh-inducing. Id. To avoid similar misunderstandings of old legal texts, we should do our best to give words the same meaning that their authors did.

drunkards. [Doc. 29 at 9]. The Government provides evidence of three distinct legal regimes that targeted habitual drunkards: vagrancy laws, civil-commitment laws, and surety laws. [Id.]. The Government argues that the tradition of regulating habitual drunkards justifies § 922(g)(3) because § 922(g)(3) targets a similar "category of persons," "habitual users of unlawful drugs," with a similar set of restrictions. [Id. at 8]. To decide whether these traditions are indeed relevantly similar, the Court turns to the historical record presented by the Government.

Vagrancy laws were enacted by several American legislatures during the 18th century, before and after the passage of the Bill of Rights. See Act of June 29, 1700, ch. 8, § 2, 1 Acts and Resolves of the Province of Massachusetts Bay 378 (1869); Act of May 14, 1718, ch. 15, 2 Laws of New Hampshire 266 (Albert Stillman Batchellor ed., 1913); Act of Oct. 1727, The Public Records of the Colony of Connecticut from May, 1726, to May, 1735, inclusive 128-29 (Charles J. Hoadly ed., 1873); Act of June 10, 1799, §§ 1, 3, Laws of the State of New-Jersey 473-74 (1821); Act of Feb. 22, 1825, ch. 297, § 4, 1825 Me. Pub. Acts 1034. These laws labeled "common drunkards" as vagrants or "disorderly persons" and empowered courts or justices of the peace to commit them to "houses of correction" or "workhouses" for a period of time. Act of Oct. 1727, The Public Records of the Colony of Connecticut

15

from May, 1726, to May, 1735, inclusive 128 (Charles J. Hoadly ed., 1873); Act of June 10, 1799, §§ 1, 3, Laws of the State of New-Jersey 473-74 (1821). In 1894, the Supreme Court even recognized that "the restraint of vagrants, beggars, and habitual drunkards" was within a state's "police power." Lawton v. Steele, 152 U.S. 133, 136 (1894).

Civil-commitment laws, another solution to alcohol abuse, became common in the middle of the 19th century. These laws generally authorized courts to commit a "habitual drunkard" to guardianship and authorized the guardian to commit the drunkard to an institution. See, e.g., Ark. Rev. Stat., ch. 78, §§ 1,19, at 456 (William M. Ball & Sam C. Roane eds., 1838). Even Congress, in March of 1876, passed a civil-commitment law. Act of Mar. 30, 1876, ch. 40, § 8, 19 Stat. 10.[7] These laws were passed both before and after the passage of the Fourteenth Amendment in 1868.[8] See, e.g., Ark. Rev. Stat., ch. 78, §§ 1,19, at 456 (William M. Ball & Sam C. Roane eds.,

---

[7] The law created an asylum in the District of Colombia and empowered courts to decide whether a person was an "inebriate or habitual drunkard," and then "issue a warrant committing" the drunkard to the asylum. Act of Mar. 30, 1876, ch. 40, § 8, 19 Stat. 10.

[8] The Supreme Court has not articulated exactly how to weigh 19th century evidence in Bruen's historical inquiry. 597 U.S. at 38 ("We need not address this issue today because, as we explain below, the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same."). The Supreme Court still analyzed the 19th century evidence in great depth. Id. at 50-66. But it used the evidence mainly as a confirmation of what had already been established. Id. at 65-66. Here, the civil-commitment laws confirm rather than contradict the conclusions drawn from the vagrancy laws, the founding-era evidence. If the civil-commitment laws had led to conclusions contrary to those of the vagrancy laws, the Court would not rely on them.

1838); Act of Mar. 2, 1868, ch. 60, §§ 1-5, The General Statutes of the State of Kansas 553 (John M. Price et al. eds., 1868); Act of Apr. 1, 1870, ch. 426, § 2, 1869-1870 Cal. Stat. 585-586; Act of Mar. 28, 1872, ch. 996, §§ 10-11, 1872 Ky. Acts, Vol. 2, at 523-524;  Act of July 25, 1874, ch. 113, § 1, 1874 Conn. Pub. Acts 256; Act of May 1, 1890, ch. 42, § 1, 1890 Iowa Acts 67; Act of July 8, 1890, No. 100, § 1, 1890 La. Acts 116.

Last are the surety laws.  These laws "authorized magistrates to require individuals suspected of future misbehavior to post a bond."  Rahimi, 602 U.S. at 695.  "If an individual failed to post a bond, he would be jailed." Id.  If he "did post a bond and then broke the peace, the bond would be forfeit."  Id.  The laws did not require disarmament, but they could be used to target "the misuse of firearms," requiring those who "go armed offensively" to forfeit their bonds.  Id. at 696.  Most importantly for this case, the surety mechanism was applied to "common drunkards."  4 William Blackstone, Commentaries on the Laws of England 256 (12th ed. 1793); United States v. Harris, 144 F.4th 154, 159 (3d Cir. 2025) ("Drunks had to promise not to break the peace, lest they be locked up and disarmed.").  Founding-era manuals for justices of the peace authorized magistrates to require "common drunkards" to post bonds for good behavior.  Eliphalet Ladd, Burn's

Abridgement, Or the American Justice 406 (2d ed. 1792); James Parker,

Conductor Generalis 410 (John Patterson prtg. 1788).

The justification for and the burden imposed by these legal regimes are analogous to the justification for and burden imposed by § 922(g)(3). The vagrancy and commitment laws confined habitual drunkards, thereby disarming them, to keep them off the streets and out of trouble. The surety laws required habitual drunkards to post bonds at risk of forfeiting money or being imprisoned, "to stop harm before it happened." United States v. Jackson, 152 F.4th 564, 577 (4th Cir. 2025). Similarly, § 922(g)(3) disarms habitual drug users to "keep[] guns out of the hands of dangerous persons." Carter I, 669 F.3d at 417. These three legal regimes, "[t]aken together," are relevantly similar to § 922(g)(3). Rahimi, 602 U.S. at 698. Though § 922(g)(3) "is by no means identical to these founding era regimes, [] it does not need to be." Id. A single justification underpins all these laws: "safeguard[ing] the public" from "individuals whose cognitive abilities are [habitually] hampered by chemical substances." United States v. Seiwert, 152 F.4th 854, 866 (7th Cir. 2025).

The laws impose similar burdens too. Broadly, they all prevent those who habitually use intoxicating substances from misusing firearms—whether through disarmament, confinement, or bond requirements. Moreover, the

burden imposed by § 922(g)(3) is like the burden that was approved in Rahimi. First, § 922(g)(3) "applies only once a court has found that the defendant" is a user of unlawful drugs. 602 U.S. at 699. The vagrancy, civil-commitment, and surety laws likewise all required "judicial determinations of whether a particular defendant" was a common or habitual drunkard. Id. Indeed, the historical laws required only civil proceedings, while § 922(g)(3) requires full criminal process. Second, like the "surety bonds of limited duration," as well as the vagrancy and commitment laws, § 922(g)(3)'s restriction is "temporary," applying only while a person is an unlawful drug user. Id.; United States v. Gould, 146 F.4th 421, 433 (4th Cir. 2025) ("We've explained that § 922(g)(3)'s ban is permissible because it covers only the time period during which Congress deemed such persons to be dangerous." (citation modified)). At any time, the drug user can choose to restore his right to keep and bear arms by swearing off the habitual use of illegal drugs. Third, the vagrancy and commitment laws provided for confinement, "and if imprisonment was permissible," "then the lesser restriction of temporary disarmament that [§ 922(g)(3)] imposes is also permissible." Rahimi, 602 U.S. at 699. In all, § 922(g)(3) imposes "similar restrictions" on a similar category of people as the vagrancy, commitment, and surety laws. Id. at 692.

Granted, problems could arise from certain as-applied challenges. Several Circuit courts have held that § 922(g)(3) may only be constitutionally applied after a judicial determination that the defendant is dangerous. See, e.g., United States v. VanOchten, 150 F.4th 552, 560 (6th Cir. 2025) ("That tees up the ultimate question in this case: Is VanOchten himself dangerous?"); Harris, 144 F.4th at 165 (providing a list of factors to use "in determining whether someone's drug use suggests that he likely poses an increased risk of physical danger to others if armed" (citation modified)); United States v. Cooper, 127 F.4th 1092, 1096 (8th Cir. 2025) (summarizing the relevant question as whether "he induce[d] terror or pose[d] a credible threat to the physical safety of others with a firearm" (citation modified)). But this is a facial challenge, and such a challenge only requires that the Government prove that *some* "set of circumstances exists under which the Act would be valid." Salerno, 481 U.S. at 745. The Government has done so here.

Because the Government has identified historical analogues that are relevantly similar to § 922(g)(3), the Court concludes that the Government has carried its burden to show that § 922(g)(3) "is consistent with this Nation's historical tradition of firearm regulation." Bruen, 597 U.S. at 34.

Thus, because some set of circumstances exists under which the law would be valid, the Court rejects the Defendant's facial challenge to § 922(g)(3).

As for the Defendant's as-applied challenge, he argues that the Criminal Complaint only establishes his "drug use approximately two months before possession." [Doc. 18 at 6]. He claims that "[t]here is no historical analog[ue] for disarmament under that factual scenario." [Id.]. In other words, he argues that no historical analogues justify disarming a person who last used intoxicating substances two months prior to possessing a firearm.

Because the question of when the Defendant last used controlled substances depends on the evidence that the Government will present at trial, the Court defers ruling on this argument until trial. See United States v. Covington, 395 U.S. 57, 60 (1969). Thus, the Defendant's motion to dismiss for Second Amendment violations is denied at this preliminary stage.

### B.    Motion to Dismiss for Due Process Violations

The Defendant also argues that § 922(g)(3) is "unconstitutionally vague facially and as applied." [Id.]. He claims that the text of § 922(g)(3) and the "judicial gloss" that it has been given "failed to provide [him] with notice," violating the Fifth Amendment's Due Process Clause. [Id. at 7, 9]. He also brings an as-applied challenge, arguing that the most recent drug

use established by the Criminal Complaint predates the gun possession by two months, and that such use is not "contemporaneous." [Id. at 9].

The Defendant concedes that his facial challenge is foreclosed at this stage. [Id. at 1 n.1]; see Claybrooks, 90 F.4th at 255 ("[W]hen a defendant's conduct falls squarely within the confines of the disputed statute, he abandons the right to challenge that statute for vagueness."). As for his as-applied challenge, it hinges on factual determinations about the Defendant's drug use. Because a "trial of the facts surrounding the commission of the alleged offense would be of [] assistance in determining the validity" of the motion, the as-applied challenge would be best resolved at a trial on the merits. Covington, 395 U.S. at 60. Thus, the motion to dismiss for Fifth Amendment violations is denied at this preliminary stage.

## C. Conclusion

The Court rejects the Defendant's facial challenge to § 922(g)(3) under the Second Amendment and defers until trial the Defendant's as-applied challenge under the Second Amendment. The Court also defers until trial the Defendant's facial and as-applied challenges under the Fifth Amendment. Accordingly, the motion to dismiss is denied.

# O R D E R

**IT IS, THEREFORE, ORDERED** that the Defendant's Motion to

Dismiss Count II of the Indictment [Doc. 18] is **DENIED**.

**IT IS SO ORDERED.** Signed: December 10, 2025

Martin Reidinger
Chief United States District Judge